SANFORD JAY ROSEN – 062566
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
BENJAMIN BIEN-KAHN – 267933
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

DANIEL MARSHALL – Fla. Bar No. 617210*
HUMAN RIGHTS DEFENSE CENTER
P.O. Box 1151
Lake Worth, FL 33460
Telephone:  (561) 360-2523
* *Pro Hac Vice* Application to be filed

Attorneys for
HUMAN RIGHTS DEFENSE CENTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER,, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF NAPA; DINA JOSE, Director of Corrections, individually and in her official capacity; and JOHN AND JANE DOES 1-10, Staff, individually and in their official capacities, <br><br> Defendants. | Case No.: 3:20-cv-01296-JCS <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge:   Hon. Joseph C. Spero <br> Date:    April 3, 2020 <br> Time:   9:30 a.m. <br> Crtrm.:  F |

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

# TABLE OF CONTENTS

Page

NOTICE OF MOTION.................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES................................................ 2

INTRODUCTION ........................................................................................................ 2

FACTUAL BACKGROUND....................................................................................... 3

    A.    HRDC's Publications ................................................................................ 3

    B.    Defendants' Unconstitutional Mail and Book Policies and Practices............. 5

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................... 9

I.    HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.............. 9

    A.    Defendants Are Violating HRDC's First Amendment Right to Communicate With Incarcerated Persons. ...................................................... 9

        1.    Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives. ......................... 10

        2.    Defendants Have Failed To Provide Alternative Means Of Exercising HRDC's First Amendment Rights. ............................... 15

        3.    Defendants' Mail Policies and Practices Fail The Third and Fourth Prongs of the Turner Standard (Effect On Resources and Feasibility of Alternative Policies). ............................... 16

    B.    Defendants Have Violated The Due Process Clause By Failing To Provide HRDC With Adequate Notice And Opportunity To Challenge Defendants' Censorship.................................................... 18

II.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM. ........................................................................ 20

III.    THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION. ......................................................................................... 21

IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST. ............ 22

V.    THE BOND REQUIREMENT SHOULD BE WAIVED...................................... 23

CONCLUSION................................................................................................ 24

i    Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Ashker v. Cal. Dep't of Corrs.*,
350 F.3d 917 (9th Cir. 2003) ............................................................. 10, 11

*Baca v. Moreno Valley Unified Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) ........................................................ 24

*Beard v. Banks*,
548 U.S. 521 (2006) ........................................................................... 15

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs.*,
181 F. Supp. 2d 1111 (E.D. Cal. 2001) ................................................. 23

*Clement v. Cal. Dept. of Corrs.*,
364 F.3d 1148 (9th Cir. 2004) ............................................................. 18

*Connick v. Myers*,
461 U.S. 138 (1983) ............................................................................. 9

*Crofton v. Roe*,
170 F.3d 957 (9th Cir. 1999) ............................................................... 10

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................... 20

*Frost v. Symington*,
197 F.3d 348 (9th Cir. 1999) ............................................................... 11

*Hernandez v. County of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) .................................................. 24

*Hrdlicka v. Reniff*,
631 F.3d 1044 (9th Cir. 2011) ........................................................ 10, 18

*Human Rights Defense Center v. Sw. Va. Reg'l Jail Auth.*,
No. 1:18CV00013, 2018 WL 3239299 (W.D. Va. Jul. 3, 2018) ...................... 17, 21

*Jacklovich v. Simmons*,
392 F.3d 420 (10th Cir. 2004) ............................................................. 19

*Jackson v. Elrod*,
671 F. Supp. 1508 (N.D. Ill. 1987) ....................................................... 17

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009) ............................................................... 20

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ............................................................... 23

ii

[3501742.1]

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ..................................................... 8, 20, 22

*Krug v. Lutz*,
    329 F.3d 692 (9th Cir. 2003) ................................................................. 19

*McKune v. Lile*,
    536 U.S. 24 (2002) ................................................................................. 14

*Montcalm Publ'g Corp. v. Beck*,
    80 F.3d 105 (4th Cir. 1996) .................................................................. 19

*Morrison v. Hall*,
    261 F.3d 896 (9th Cir. 2001) ........................................................... 15, 18

*Paris Adult Theatre I v. Slaton*,
    413 U.S. 49 (1973) ................................................................................. 14

*Pell v. Procunier*,
    417 U.S. 817 (1974) ................................................................................. 9

*Prison Legal News v. Cook*,
    238 F.3d 1145 (9th Cir. 2001) ................................................ 9, 10, 17, 19

*Prison Legal News v. County of Sacramento*,
    No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852 (E.D. Cal. Mar. 8, 2012) ...... 11

*Prison Legal News v. County of Ventura*,
    No. CV 14–773–GHK (ex), 2014 WL 2519402 (C.D. Cal. May 29, 2014) ...... 21, 23

*Prison Legal News v. Lehman*,
    397 F.3d 692 (9th Cir. 2005) ........................................................... 10, 17

*Procunier v. Martinez*,
    416 U.S. 396 (1974), *overruled in part on other grounds by Thornburgh v.*
    *Abbott*, 490 U.S. at 401 (1989) ..................................................... passim

*Sammartano v. First Judicial Dist. Court*,
    303 F.3d 959 (9th Cir. 2002), *abrogated on other grounds by Winter v.*
    *Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................. 22

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) .............................................................. 23

*Save Strawberry Canyon v. Dep't of Energy*,
    613 F. Supp. 2d 1177 (N.D. Cal. 2009) .................................................. 23

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ................................................................. 8

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989) ...................................................................... 9, 10, 19

*Turner v. Safley*,
    482 U.S. 78 (1987) ............................................................................ passim

iii

[3501742.1]

*United Food & Commercial Workers Local 99 v. Brewer,*
    817 F. Supp. 2d 1118 (D. Ariz. 2011) .................................................................. 23

*Walker v. Sumner,*
    917 F.2d 382 (9th Cir. 1990) ............................................................................ 11

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005) ............................................................................ 20

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 8

**RULES**

Fed. R. Civ. P. 65 .................................................................................................. 23

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

# NOTICE OF MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on **April 3, 2020, at 9:30 a.m.**, or as soon thereafter as the matter may be heard, Plaintiff Human Rights Defense Center ("Plaintiff"), by its undersigned counsel, pursuant to Federal Rule of Civil Procedure 65(a), will and hereby does move this Court to issue a preliminary injunction enjoining Defendant County of Napa and Defendant Dina Jose (collectively "Defendants") from implementing unconstitutional mail policies and practices and refusing to deliver Plaintiff's publications and correspondence to incarcerated persons in Defendants' custody.  This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declarations of Paul Wright and John L. Clark filed herewith, the pleadings in the above-captioned matter, and any oral argument or evidence permitted at any hearings on this motion.

DATED:  February 21, 2020                 Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Jeffrey L. Bornstein*
     Jeffrey L. Bornstein

Attorneys for
HUMAN RIGHTS DEFENSE CENTER

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff, Human Rights Defense Center ("HRDC" or "Plaintiff") files this motion to enjoin the County of Napa (the "County") and its Director of Corrections, Dina Jose (collectively, the "Defendants") from unconstitutionally censoring HRDC's books, magazines and correspondence mailed to incarcerated persons, and from failing to provide due process to challenge censorship decisions.  HRDC's mission is to provide incarcerated persons with reading materials with news and analysis relevant to their constitutional and human rights and options for accessing education while incarcerated.  To advance that mission, HRDC publishes and distributes magazines and books to incarcerated persons, and also mails them other written communications, including informational brochure packets and judicial opinions of import to incarcerated persons.

Since May 2019, Defendants have engaged in at least forty-three (43) separate instances of unlawful suppression of HRDC's speech without due process, by refusing to deliver books, magazines, and correspondence mailed by HRDC to persons incarcerated at the Napa County Jail (the "Jail"), in violation of the First Amendment and Article I, Section 2 of the California Constitution, and have failed to provide adequate notice and opportunity to challenge the censorship decisions, in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 7 of the California Constitution.  By implementing these policies and practices with reckless disregard for clearly established free speech and due process rights of Plaintiff and others who send publications and correspondence to incarcerated persons by mail, Defendants are interfering with the exercise and enjoyment of Plaintiff's constitutional rights in violation of the Bane Act, California Civil Code § 52.1.

HRDC's publications and correspondence pose no threat to the safety or security of the Jail and, in fact, have been successfully mailed to incarcerated persons in thousands of jails and prisons across the United States for nearly thirty years without incident.  Plaintiff attempted to resolve these violations without litigation by filing a Claim for Damages on

2

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

1  August 20, 2019, which was summarily rejected by the County on September 9, 2019,

2  without any information about why HRDC's mail was being censored or whether there

3  was any means by which HRDC could appeal the censorship by Defendants.

4      As Defendants' censorship is not rationally related to any legitimate penological

5  interest, and HRDC's free speech rights are being eviscerated without due process,

6  Plaintiff's likelihood of success on the merits is great.  The violations of HRDC's

7  constitutional rights are causing irreparable harm and the balance of hardships from

8  Defendants' continuing refusal to deliver Plaintiff's publications tilts sharply toward

9  Plaintiff.  A preliminary injunction should be granted.

10                      **FACTUAL BACKGROUND**

11      **A.**       **HRDC's Publications**

12      The Human Rights Defense Center is a not-for-profit charitable organization under

13  Section 501(c)(3) of the Internal Revenue Code.  *See* Declaration of Paul Wright in

14  Support of Plaintiff's Motion for Preliminary Injunction ("Wright Decl.") ¶ 2.  For nearly

15  30 years, HRDC has focused its mission on public education, advocacy and outreach to

16  incarcerated persons and the public about the economic and social costs of prisons to

17  society, and to help incarcerated persons to educate themselves about their constitutional

18  and human rights and to learn about accessing education while incarcerated.  *Id*.  HRDC

19  accomplishes this mission through advocacy, litigation, and publication and distribution of

20  books, magazines, and other information about correctional facilities and the rights of

21  incarcerated persons.  *Id*.

22      HRDC publishes two soft-cover magazines, which are each printed on newsprint

23  bound by two small staples.  Wright Decl. ¶¶ 4-5.  HRDC publishes and distributes an

24  award-winning monthly magazine titled *Prison Legal News: Dedicated to Protecting*

25  *Human Rights*, which contains news and analysis about the conditions and management of

26  correctional facilities, the rights of incarcerated persons, court opinions, and other matters

27  pertaining to the interests of incarcerated persons.  *Id.* ¶ 4.  HRDC also publishes and

28  distributes a second monthly magazine titled *Criminal Legal News*, which contains news

3

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

1    and analysis about individual rights, court rulings, and other criminal justice-related issues.

2    *Id.* ¶ 5.  HRDC's magazines provide incarcerated persons with timely, in-depth coverage

3    of judicial decisions and other recent events concerning the criminal justice system in a

4    way that would be impossible through other means of communication.  *Id.* ¶ 6.

5       HRDC also distributes several different soft-cover books on criminal justice, health,

6    and legal issues that are of interest to incarcerated persons and others.  Wright Decl. ¶ 7.

7    Pertinent to this case, HRDC publishes the *Prisoners' Guerilla Handbook: A Guide to*

8    *Correspondence Programs in the United States and Canada* ("*Prisoners' Handbook*"),

9    which provides incarcerated persons information on enrolling at accredited higher

10    educational, vocational and training schools.  *Id.*  HRDC also publishes *The Habeas*

11    *Citebook: Ineffective Assistance of Counsel* ("*Habeas Citebook*"), which describes the

12    procedural and substantive complexities of federal habeas corpus litigation with the goal of

13    identifying and litigating claims involving ineffective assistance of counsel.  *Id.*  HRDC

14    does not publish, but is the sole national distributor of *Protecting Your Health and Safety*

15    ("*PYHS*"), which describes the rights, protections and legal remedies available to persons

16    concerning their health and safety while they are incarcerated.  *Id.*

17       HRDC also communicates with incarcerated persons through the mail by sending

18    them (a) informational brochure packets, which contain a brochure and subscription order

19    form, a book list, and a published books brochure; (b) copies of judicial opinions of import

20    to incarcerated persons in envelopes marked "Court Ruling;" and (c) letters that provide

21    pertinent information about HRDC's publications and related topics.  Wright Decl. ¶ 9.

22       Since its creation in 1990, HRDC has sent its publications to incarcerated persons

23    and law librarians in more than 3,000 correctional facilities in all fifty states, including at

24    death row housing units and "supermax" prisons, including the federal Administrative

25    Maximum Facility at Florence, Colorado—the most secure prison in the United States.

26    Wright Decl. ¶ 12.  HRDC's publications are distributed to hundreds of persons

27    incarcerated in California jails and prisons, including at San Diego County's Central Jail

28    and Vista Detention Facility, Los Angeles County's Twin Towers Correctional Facility,

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

Orange County's Theo Lacy Facility, San Bernardino County's West Valley Detention Center, Sacramento County's Rio Cosumnes Correctional Center, the Fresno County Jail, the Humboldt County Correctional Facility, the Madera County Jail, the Santa Clara County Main Jail, Alameda County's Santa Rita County Jail, the San Joaquin County Jail, the Ventura County Detention Center, and 32 prisons run by the California Department of Corrections and Rehabilitation ("CDCR").  *Id.*  In its nearly 30-year history, HRDC is not aware of and has never been notified of any security incident caused by any of its publications or correspondence at any jail or prison.  *Id.* ¶ 20.

### B.    Defendants' Unconstitutional Mail and Book Policies and Practices

Since May 2019, HRDC has mailed magazines, books and other correspondence to incarcerated persons at the Jail.  Wright Decl. ¶¶ 21-26.  Each of these items were individually addressed and separately mailed with postage fully paid.  *Id.* ¶¶ 10, 21, 23. Defendants, however, have refused to deliver many of these items to the intended recipients.  *Id.* ¶ 27.  Since May 2019, Defendants have censored at least forty-three (43) items of mail sent to incarcerated persons at the Jail by HRDC, including fifteen (15) issues of *Prison Legal News*, eleven (11) issues of *Criminal Legal News*, eight (8) copies of *PYHS*, five (5) copies of the *Habeas Citebook*, three (3) copies of the *Prisoner's Handbook*, and one (1) letter.  *Id.* ¶ 28; *see also id.* ¶¶ 32-37.[1]  Each item of mail was returned to HRDC by Defendants via the "Return to Sender" service of the United States Postal Service ("USPS"), at HRDC's expense.  *Id.* ¶ 28.

All but four of the returned items of mail that Defendants refused to deliver to incarcerated persons at the Jail were marked with an ink stamp that contained the words "RETURN TO SENDER," followed by four short statements directly underneath, which read as follows:

---

[1] **Exhibit A** to the Wright Declaration is a spreadsheet of information kept in the normal course of business by HRDC that lists all items of mail that were returned by the Jail to HRDC, excluding returned mail that was intended for incarcerated persons who were no longer in custody at the Jail.  Wright Decl. ¶ 27.  **Exhibit B** to the Wright Declaration contains true and correct electronic copies of each returned item.  *Id.*

[3501742.1]

1          __ Not in Custody

2               __ Contraband Enclosed

3               __ Other (specify)

4               _____

5               Officer's Signature/Date

6    Wright Decl. ¶ 29.  Most of the returned items of mail included a date and initials

7    handwritten in ink above the words "Officer's Signature/Date."  *Id.*

8          For twenty-two of the twenty-six issues of HRDC's magazines that Defendants

9    rejected, the "__ Contraband Enclosed" category was marked, and the phrase "staples not

10   allowed" was handwritten in ink on the returned magazine.  *Id.* ¶ 30.  For all sixteen of

11   HRDC's books that Defendants refused to deliver, the "__ Other (specify)" category was

12   marked, and the phrase "vendor not authorized" was handwritten in ink on the returned

13   book.  *Id.* ¶ 31.  For the one letter mailed by HRDC that Defendants refused to deliver, the

14   "__ Other (specify)" category was also marked, but no information was provided as to why

15   Defendants rejected the letter for delivery to the intended recipient.  *Id.*  The remaining

16   four rejected mailings—four issues of *Criminal Legal News*—were returned without the

17   above-described ink stamp or any markings at all to indicate why they were rejected by

18   Defendants.  *Id.* ¶ 30.  None of the rejected items of mail included any further explanation

19   as to why Defendants had refused to deliver them, and no notice was provided by

20   Defendants of a right to appeal the rejections or any information on how HRDC could

21   challenge the rejections of its mailings.  *Id.* ¶¶ 30-31.  Defendants never provided notice to

22   HRDC prior to the censorship, nor was HRDC provided any opportunity to appeal the

23   censorship decisions.  *Id.* ¶ 42.

24         Defendants' mail policy is set out on the Napa County Department of Corrections

25   website.  *See* Napa County Department of Corrections, *Inmate Mail Correspondence*,

26   https://www.countyofnapa.org/320/Inmate-Mail-Correspondence ("Mail Policy").  A copy

27   of this policy as of February 20, 2020 is attached as **Exhibit K** to the Wright Declaration.

28   Wright Decl. ¶ 46.  Defendants' Mail Policy is contradictory on its face:  it provides that

Case No. 3:20-cv-01296-JCS

[3501742.1]

"All magazines, books, newspapers, and any other literature must be sent from the publisher," but then limits paperback books to only those "mailed directly from Barnes and Noble." *Id.* ¶ 46, Ex. K.  Defendants' Mail Policy also states that any mail considered "contraband" will be returned to the sender, and defines contraband as stickers, glitter, Polaroid pictures, excess foreign substances, money, "[m]ail containing potential security issues or evidence of a potential crime," and "[n]ude photographs , pornography, or materials judged likely to offend a particular person or group including drawings or pictures of friends, relatives, or acquaintances." *Id.*  By the terms of Defendants' Mail Policy, none of HRDC's rejected mailings qualify as contraband. *Id.* ¶ 49.  Defendants' Mail Policy also does not provide for any process to appeal a censorship decision. *Id.* ¶ 46, Ex. K.

While there is nothing in Defendants' Mail Policy that indicates that staples are not allowed or are considered a security issue, Wright Decl. ¶ 46, Ex. K, the markings on many of the issues of *Criminal Legal News* and *Prison Legal News* returned to HRDC through the USPS Return to Sender service indicate that they were rejected because "staples not allowed," *id.* ¶ 30, which is not a legitimate penological basis for refusing to deliver HRDC's magazines.  HRDC has distributed over one million copies of its monthly magazines with staples in its nearly 30-year history, and has never learned of staples from its publications being used to cause any security problems. *Id.* ¶ 48.  Plaintiffs' corrections expert also has never encountered ordinary magazine staples posing a legitimate security threat at any jail or prison.  Declaration of John L. Clark in Support of Plaintiff's Motion for Preliminary Injunction ("Clark Decl.") ¶¶ 45-47.

The markings on the books returned to HRDC through the USPS Return to Sender service indicate that they were rejected because "vendor not authorized."  Wright Decl. ¶ 31.  Defendants' Mail Policy states that books and magazines "must be sent from the publisher," but then contradicts itself by stating that paperback books will only be accepted if "mailed directly from Barnes and Noble."  Wright Decl. ¶ 46, Ex. K.  HRDC is the publisher of four of the five books and magazines censored by Defendants, and is the sole

1    nationwide distributor of *PHYS*.  *Id.* ¶ 47.  To the extent that Defendants have refused to

2    deliver *PYHS* because HRDC is not the publisher, there is no penological basis for this

3    arbitrary restriction, and Defendants' Mail Policy includes no rationale for allowing only

4    Barnes and Noble to distribute books to incarcerated persons at the Jail.  *See* Clark Decl.

5    ¶¶ 43-44.  This is especially arbitrary as applied to HRDC, a not-for-profit charitable

6    organization that has been mailing publications to incarcerated persons at thousands of

7    jails and prisons for decades without incident.  *See* Wright Decl. ¶¶ 2, 11-12, 48.

8         HRDC brought these problems to the County's attention through a government tort

9    claim submitted on August 20, 2019.  Wright Decl. ¶ 43, Ex. I.  The County rejected the

10   claim on September 9, 2019.  Wright Decl. ¶ 43, Ex. J.  The County's rejection letter did

11   not provide any information about why HRDC's mail was censored, how HRDC could

12   appeal the censorship, or the means by which HRDC could become an authorized vendor.

13   *Id*. ¶ 44 & Ex. J.  By its adoption and application of these policies and practices,

14   Defendants are impermissibly interfering with protected expressive activities and chilling

15   future speech from HRDC and others.  Since HRDC continues, and will continue, to

16   communicate with incarcerated persons confined at the Jail, *see id.* ¶ 45, Defendants'

17   current policies and practices, unless enjoined, will continue to violate HRDC's

18   constitutional rights, causing irreparable harm.

19                                **LEGAL STANDARD**

20        A preliminary injunction is appropriate where a plaintiff demonstrates "'[1] that he

21   is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

22   absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that

23   an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127

24   (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

25   Ninth Circuit precedent "clearly favors granting preliminary injunctions to a plaintiff …

26   who is likely to succeed on the merits of his First Amendment claim."  *Klein v. City of San*

27   *Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

28

1

**ARGUMENT**

2   **I.   HRDC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.**

3      **A.   Defendants Are Violating HRDC's First Amendment Right to Communicate With Incarcerated Persons.**

4

5      Defendants' policies and practices violate settled law on the First Amendment

6   rights of publishers and incarcerated persons.  "Prison walls do not form a barrier

7   separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482

8   U.S. 78, 84 (1987), nor do they bar others "from exercising their own constitutional rights

9   by reaching out to those on the 'inside,'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).

10  Courts have long held that publishers and incarcerated persons have First Amendment

11  rights to communicate with each other, subject only to limitations required by legitimate

12  security concerns.  "[T]here is no question that publishers who wish to communicate with

13  those who … willingly seek their point of view have a legitimate First Amendment interest

14  in access to prisoners." *Thornburgh*, 490 U.S. at 408.  Indeed, the interests of senders and

15  their intended recipients are "inextricably meshed," and "censorship of prisoner mail

16  works a consequential restriction on the First and Fourteenth Amendments rights of those

17  who are not prisoners." *Procunier v. Martinez*, 416 U.S. 396, 409 (1974), *overruled in*

18  *part on other grounds by Thornburgh v. Abbott*, 490 U.S. at 411-414.  "Whatever the

19  status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that

20  the latter's interest is grounded in the First Amendment's guarantee of freedom of speech."

21  *Id*. at 408.

22      HRDC's speech covers topics of great public concern and therefore "occupies the

23  highest rung of the hierarchy of First Amendment values, and is entitled to special

24  protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks

25  omitted); *see also Pell v. Procunier*, 417 U.S. 817, 830 n.7 (1974) ("[T]he conditions in

26  this Nation's prisons are a matter that is both newsworthy and of great public

27  importance"); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (holding

28  speech contained in *Prison Legal News* is core protected speech).

9                                    Case No. 3:20-cv-01296-JCS

[3501742.1]

To withstand First Amendment scrutiny, a jail or prison policy must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. This inquiry turns on four factors:

> (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right, (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Cook*, 238 F.3d at 1149 (citing *Turner*, 482 U.S. at 89-90). If a correctional facility "fails to show that the regulation is rationally related to a legitimate penological objective, [courts] do not consider the other factors," and the rule is invalid. *Ashker v. Cal. Dep't of Corrs.*, 350 F.3d 917, 922 (9th Cir. 2003). While respectful of correctional officials' expertise, *Turner*'s "reasonableness standard is not toothless." *Thornburgh*, 490 U.S. at 414 (internal quotation marks omitted).

Accordingly, the Ninth Circuit has regularly ruled in favor of publishers challenging rules restricting delivery of their publications to incarcerated persons, and has specifically upheld HRDC's right to send *Prison Legal News* to incarcerated persons. *See, e.g.*, *Hrdlicka v. Reniff*, 631 F.3d 1044, 1055 (9th Cir. 2011) (addressing ban on unsolicited publications); *Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2005) (rejecting regulation that prevented delivery of *Prison Legal News*); *Cook*, 238 F.3d at 1149-1150 (same); *Crofton v. Roe*, 170 F.3d 957, 960-961 (9th Cir. 1999) (rejecting ban on gift publications). HRDC is highly likely to prevail on each of the *Turner* factors.[2]

### 1. Defendants' Mail Policies And Practices Are Not Rationally Related To Any Legitimate Penological Objectives.

The first *Turner* factor looks to whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to

---

[2] While this case involves HRDC's free speech rights (and not the rights of incarcerated persons), for purposes of this motion, HRDC assumes the Court will apply the *Turner* test to ensure that injunctive relief employs due deference for the exigencies of jail operations.

[3501742.1]

1   justify it." *Turner*, 482 U.S. at 89.  "The first factor is a *sine qua non*….  Therefore, if the

2   prison fails to show that the regulation is rationally related to a legitimate penological

3   objective, [the Court] do[es] not consider the other factors."  *Ashker*, 350 F.3d at 922

4   (citations omitted).  Under this prong, "the 'logical connection between the regulation and

5   the asserted goal' must not be 'so remote as to render the policy arbitrary or irrational,' and

6   the governmental objective must be both 'legitimate and neutral.'"  *Frost v. Symington*,

7   197 F.3d 348, 354 (9th Cir. 1999) (quoting *Turner*, 482 U.S. at 89-90).  When a plaintiff

8   refutes a "common-sense connection between a legitimate objective and a prison

9   regulation," the defendant "must present enough counter-evidence to show that the

10  connection is not so 'remote as to render the policy arbitrary or irrational.'"  *Id.* at 357

11  (citations omitted).

12          Prison authorities cannot rely on general or conclusory assertions to support
           their policies.  Rather, they must first identify the specific penological
13         interests involved and then *demonstrate* both that those specific interests are
           *the actual bases* for their policies and that the policies are reasonably related
14         to the furtherance of the identified interests.  An *evidentiary showing* is
           required as to each point.

15

16  *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990) (emphasis added).

17          Here, it cannot be reasonably argued that there is any "valid, rational connection"

18  between Defendants' censorship of HRDC's mailings and any legitimate governmental

19  interest.  The basis for Defendants' censorship is unknown for at least five of the censored

20  items, which were returned without any explanation as to why they were rejected by

21  Defendants.  Wright Decl. ¶¶ 30-31.  Twenty-two issues of HRDC's magazines appear to

22  have been rejected because they contain staples, and the sixteen books mailed by HRDC to

23  incarcerated persons were all returned with the marking "vendor not authorized."  *Id.*

24  Neither of these stated reasons justify Defendants' censorship.

25          First, Defendants' rejection of Plaintiff's magazines on the ground that they include

26  staples is not supported by any legitimate penological interest.  *See Prison Legal News v.*

27  *County of Sacramento*, No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852, at *1 (E.D.

28  Cal. Mar. 8, 2012) (preliminarily enjoining jail's refusal to deliver *Prison Legal News* on

11

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

1  ground that staples ban not supported by legitimate penological interest).  Plaintiff's expert

2  John L. Clark has over forty years' experience in corrections, including as the Warden of

3  two federal prisons, one of which was a supermax facility, as Assistant Director of the

4  Federal Bureau of Prisons, and as Chief of the Community Corrections and Detention

5  Division.  Clark Decl. ¶¶ 2-4.  He testifies:  "Put simply, prisoners' and detainees' access

6  to stapled publications is not a legitimate concern for corrections professionals."  *Id.* ¶ 47.

7  The staples used in HRDC's magazines are less than an inch long and are thin, weak, and

8  flimsy.  *Id.* ¶ 45.  During Mr. Clark's career in corrections, "tiny gauge magazine staples

9  [like those used in HRDC's publications] have never been identified as the source of

10  significant security problems," and "the evidence-based experience and judgment of [a]

11  broad range of administrators across numerous prison systems has not borne out potential

12  security concerns about magazine staples," which are "commonly accepted in jails and

13  prisons all over the country.  *Id.* ¶¶ 46-47.

14      If publications with staples were a legitimate threat to the safety of correctional

15  facilities—they are not—one would presume other jails and prisons would also ban

16  publications with staples.  *See Procunier*, 416 U.S. at 414 n.14 ("While not necessarily

17  controlling, the policies followed at other well-run institutions would be relevant to a

18  determination of the need for a particular type of restriction.").  Over one million copies of

19  *Prison Legal News* with staples have been delivered since publication commenced in 1990

20  to about 3,000 correctional facilities, including death row units, maximum security units,

21  and supermax prisons, yet none of the high-security institutions have ever raised any

22  concern about the use of staples in HRDC's publications, and no correctional facility has

23  reported any security problems due to the staples to HRDC.  Wright Decl. ¶¶ 11-12, 48.

24  There is no evidence that a standard magazine staple such as that used by HRDC for its

25  publications has ever been used as a weapon, nor is there any risk of such harm.  *Id.* ¶ 48;

26  *see also* Clark Decl. ¶¶ 45-47.  Finally, Defendants' markings on the returned magazines

27  indicating that they were rejected because they contain staples is dubious, as there is

28  nothing specific in Defendants' Mail Policy that states or even implies that small staples

12

Case No. 3:20-cv-01296-JCS

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

1    are a security risk or otherwise prohibited at the Jail.  *See* Wright Decl. ¶ 46, Ex. K.

2         Second, there is no rational connection between Defendants' censorship of HRDC's

3    books any legitimate penological interest.  Defendants' Mail Policy contradictorily states

4    that "[a]ll … books … must be sent by the publisher," yet also states that paperback books

5    must be "mailed directly from Barnes and Noble."  Wright Decl. ¶ 46, Ex. K.  HRDC is

6    the publisher of the *Prisoners' Handbook* and the *Habeas Citebook*, *id.* ¶ 7, yet Defendants

7    still refused to deliver these books to incarcerated persons at the Jail and returned them to

8    HRDC marked "vendor not authorized," *id.* ¶ 31.  While HRDC does not publish *PYHS*,

9    *id.* ¶ 7, there would be no legitimate penological basis for Defendants' arbitrarily allowing

10   books mailed directly from the publisher while banning neutral outside book distributors

11   from mailing books that they do not publish to incarcerated persons at the Jail.  Clark Decl.

12   ¶¶ 43-44.

13        If Defendants are refusing to deliver the books mailed to incarcerated persons by

14   HRDC on the ground that HRDC is not an authorized vendor, there is no legitimate

15   penological basis for Defendants' arbitrary ban on the mailing of books by all legitimate

16   publishers and distributors other than Barnes and Noble.  Jails and prisons do have a

17   legitimate penological interest in restricting publications from being sent directly to

18   incarcerated persons "from their families or other private individuals in the community in

19   order to limit the introduction of contraband," and "[i]t is sensible to limit such mailings to

20   neutral outside distributors and publishers which present no practical threat to jail security

21   in terms of secreting contraband in their publications for delivery to particular prisoners."

22   Clark Decl. ¶ 44.  But Defendants' Mail Policy arbitrarily only allows books to be mailed

23   to incarcerated persons by one authorized vendor—Barnes and Noble—while excluding all

24   other distribution sources of books, including Plaintiff.  *Id.*   There is no stated rationale for

25   the distinction between Barnes and Noble and other legitimate outside book publishers and

26   distributors.  Wright Decl. ¶ 46, Ex. K.  There is no practical security risk to allow

27   HRDC—a not-for-profit charitable organization that has been mailing publications to

28   incarcerated persons at thousands of jails and prisons for nearly thirty years without

[3501742.1]

incident—to mail books to incarcerated persons (regardless of whether HRDC is the publisher or distributor), as Barnes and Noble is already permitted to do.  Wright Decl. ¶¶ 2, 11-12, 20, 47; *see also* Clark Decl. ¶¶ 43-44, 48-49.

The publications and correspondence that have been rejected by Defendants comply with all other provisions of Defendants' Mail Policy.  The censored publications are paperback, and HRDC's publications and correspondence do not qualify as "contraband" as defined by Defendants' Mail Policy.  Wright Decl. ¶¶ 7, 49; *see also id.* ¶ 46, Ex. K. They do not contain stickers, glitter, Polaroid pictures, excess foreign substances, money, "[m]ail containing potential security issues or evidence of a potential crime," or "[n]ude photographs, pornography, or materials judged likely to offend a particular person or group including drawings or pictures of friends, relatives, or acquaintances." *Id.* ¶ 49.  In short, there is no rational basis or penological justification for censoring HRDC's publications and correspondence.  Clark Decl. ¶¶ 48-49.

Banning reading materials actually threatens jail security because incarcerated persons' idleness can contribute to disturbances and disciplinary infractions.  Clark Decl. ¶¶ 24-25.  The information in HRDC's books also helps prepare incarcerated persons for reentry into society. *Id.* ¶ 26; Wright Decl. ¶ 13.  The Supreme Court has recognized that since "most offenders will eventually return to society, a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *McKune v. Lile*, 536 U.S. 24, 36 (2002) (internal citations and alterations omitted).  Further, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation …." *Procunier*, 416 U.S. at 412; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63 (1973) (citing the "well-nigh universal belief that good books … lift the spirit, improve the mind, enrich the human personality, and develop character….") (citations omitted).

Understanding the benefits of the availability of reading materials, corrections professionals recognize that any minimal security concerns associated with incoming publications are outweighed by the safety and security benefits they bring. *See* Clark Decl.

14

[3501742.1]

¶¶ 24-25 ("Detention professionals widely recognize that providing inmates access to a wide variety of reading material is an essential aspect of good detention management…. Providing mental stimulation to prisoners and detainees through reading material is a valuable tool in maintaining order and security within correctional facilities."). Defendants' policies and practices are not rationally related to any legitimate penological objectives, and hamper the crucial penological objective of rehabilitation.

> **2.      Defendants Have Failed To Provide Alternative Means Of Exercising HRDC's First Amendment Rights.**

The second *Turner* factor looks to whether alternative means exist to exercise the constitutional right.  The absence of alternative means is evidence that the prison regulations in question are unreasonable.  *See Beard v. Banks*, 548 U.S. 521, 532 (2006).

Here, Defendants' censorship of HRDC's publications and correspondence leaves HRDC without any alternative means of exercising the First Amendment right at issue, *see Turner*, 492 U.S. at 90—the right to distribute its publications to incarcerated persons in furtherance of its mission to help incarcerated persons to educate themselves about their constitutional and human rights and to learn about accessing education while incarcerated. *See* Wright Decl. ¶¶ 13, 51.  HRDC cannot effectively or reasonably be expected to communicate its written speech to incarcerated persons by telephone or in-person at each of the over 5,000 prisons and jails in America.  Id. ¶ 52.  Even if it had other practical ways of communicating with incarcerated persons, HRDC's messages can be conveyed effectively only through print publications.  *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (even if incarcerated persons can obtain information from other means, such as television or radio, those avenues "should not be considered a substitute for reading newspapers and magazines").  The monthly issues of Prison Legal News and Criminal Legal News provide incarcerated persons with timely, in-depth coverage of judicial decisions and other recent events concerning our nation's criminal justice system in a way that no other method of communication can match.  Wright Decl. ¶¶ 6, 52.  The books that HRDC distributes through the mail similarly provide incarcerated persons with in-depth

information about their rights, protections and legal remedies, and on enrolling at accredited higher educational, vocational and training schools, which could not reasonably or practically be communicated in any other form. Id. ¶ 8.  Under Defendants' current policies and practices, HRDC is left with no practical way to reach its intended audience.

Moreover, to the extent that some of HRDC's publications are being censored because they contain staples, there are no reasonable alternative means for HRDC to disseminate its monthly magazines.  Wright Decl. ¶ 53.  Without the staples that hold these magazines together, they would fall apart in the mail and could not be delivered.  Id. Removing the staples and placing every issue in a large envelope prior to sending is not a plausible alternative because Prison Legal News and Criminal Legal News are printed, bound, addressed, and sorted into bundles by zip code at an off-site printing company.  Id. The printing company prints the addresses and pre-paid mailing indicia directly onto the magazines, and then delivers the bundled magazines directly to the USPS for mailing to individual subscribers.  Id.  Even if there were some way to place each copy of every issue of Prison Legal News and Criminal Legal News in an envelope, this process would be cost-prohibitive.  Id. ¶ 54.  Because HRDC mails in excess of 70,000 copies of these magazines each year, it would have to purchase at least 70,000 envelopes annually, and it would incur additional labor costs associated with placing the publications into envelopes. Id.  This is not how magazines are delivered, because it is cost-prohibitive.  Id.

### 3. Defendants' Mail Policies and Practices Fail The Third and Fourth Prongs of the Turner Standard (Effect On Resources and Feasibility of Alternative Policies).

The third and fourth *Turner* factors turn on whether accommodating the First Amendment right at issue will impose a significant burden on prison officials, and whether ready alternatives to the challenged policies exist. *Turner*, 482 U.S. at 90-91.  Where a plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.  "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not

[3501742.1]

1    reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90.

2         Allowing the exercise of the First Amendment rights at issue here will create no

3    significant burden on jail officials, other incarcerated persons, or the allocation of

4    resources.  Defendants would simply be required to deliver HRDC's publications and

5    correspondence along with the other mail delivered to incarcerated persons every day.

6    This is what thousands of other correctional facilities do with the very HRDC mailings that

7    Defendants are refusing to deliver.  Wright Decl. ¶¶ 11-12.  HRDC does not send a high

8    volume of mail to the Jail, but rather sends individually addressed mailings to a limited

9    number of incarcerated persons who subscribe to its magazines or who place orders for

10   books published and/or distributed by HRDC, or who are specifically identified by HRDC

11   as potential subscribers or people likely to be in need of the information contained in the

12   publications that HRDC distributes.  *Id.* ¶ 14.

13        For the subset of HRDC's mailings rejected because they contain staples, even if

14   staples actually presented a security threat—which they do not—Jail staff could simply

15   remove them before delivering the publications.  *See Jackson v. Elrod*, 671 F. Supp. 1508,

16   1511 (N.D. Ill. 1987) ("[P]laintiff establishes an obvious, easy alternative to rejecting a

17   book [with hard covers].  The covers easily can removed at the mailroom.").  Although Jail

18   staff would be required to spend time removing staples, this would not impose any

19   significant burden because the current process for rejecting and returning a publication

20   likely takes more time than removing two staples.  *See Human Rights Defense Center v.*

21   *Sw. Va. Reg'l Jail Auth.*, No. 1:18CV00013, 2018 WL 3239299, at *6 (W.D. Va. Jul. 3,

22   2018) (explaining that "[m]ailroom workers could remove staples from an issue of *PLN* …

23   in less time than it would take to complete, log, and mail a confiscation form," and "[t]hese

24   obvious, easy alternatives to rejecting all of HRDC's mailings outright show that the

25   defendants' restrictions are an exaggerated response to the stated concerns").  Regardless,

26   limited effects on staff time do not justify restrictions on First Amendment rights.  *See, e.g.*

27   *Lehman*, 397 F.3d at 700 (rejecting regulation designed to reduce volume of mail); *Cook*,

28   238 F.3d at 1151 (rejecting administrative burden justification for banning certain type of

[3501742.1]

1   mail where lifting the ban would result only in "the addition of 15 to 30 pieces of mail"

2   each day); *Clement v. Cal. Dept. of Corrs.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (banning

3   certain type of mail to reduce total volume is "arbitrary" method to reduce mail volume).

4          That thousands of correctional facilities nationwide allow incarcerated persons to

5   receive all types of HRDC's mail without creating penological problems highlights that

6   ready alternatives to Defendants' censorship are available.  *See, e.g.*, *Hrdlicka*, 631 F.3d at

7   1055 (final *Turner* factor favored publisher where it was undisputed that publisher's

8   magazine was already distributed in other California county jails); *Morrison*, 261 F.3d at

9   905 (looking to CDCR mail policies to conclude Oregon prison mail policies were an

10  exaggerated response).  Distribution of HRDC's books to persons incarcerated in these

11  other facilities demonstrates that Defendants' censorship is unnecessary and unreasonable,

12  and is an "exaggerated response" that cannot stand.  *Turner*, 482 U.S. at 91.

13         **B.      Defendants Have Violated The Due Process Clause By Failing To
                     Provide HRDC With Adequate Notice And Opportunity To Challenge**
14                   **Defendants' Censorship.**

15         A publisher's right to communicate with incarcerated persons is rooted not only in

16  the First Amendment, but also the Due Process Clause of the Fourteenth Amendment:

17             [T]he decision to censor or withhold delivery of a particular letter must be
               accompanied by minimum procedural safeguards.  The interest of prisoners
18             and their correspondents in uncensored communication by letter, grounded
               as it is in the First Amendment, is plainly a "liberty" interest within the
19             meaning of the Fourteenth Amendment even though qualified of necessity by
               the circumstance of imprisonment.  As such, it is protected from arbitrary
20             government invasion.

21  *Procunier*, 416 U.S. 417-418.  The Due Process Clause requires that each time a jail or

22  prison refuses to deliver a publication or other correspondence to the intended recipient, it

23  must provide both the incarcerated person and the sender notice and an opportunity to

24  challenge the censorship.  *Id.* at 418-419 (requiring "that an inmate be notified of the

25  rejection of a letter written by or addressed to him, that the author of that letter be given a

26  reasonable opportunity to protest that decision, and that complaints be referred to a prison

27  official other than the person who originally disapproved the correspondence").  This

28  requirement is clearly established and is not subject to the four-pronged *Turner* analysis.

1   *See Krug v. Lutz*, 329 F.3d 692, 698 n.5, 698-699 (9th Cir. 2003); s*ee also Cook*, 238 F.3d

2   at 1152-1153; *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004).

3         Providing due process allows publishers to investigate and challenge violations of

4   their First Amendment rights, and helps subscribers challenge such violations through the

5   correctional grievance system.  *See Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 109 (4th

6   Cir. 1996) (notice to the incarcerated person alone is insufficient because "[a]n inmate who

7   cannot even see the publication can hardly mount an effective challenge to the decision to

8   withhold that publication").  Correctional facilities in other jurisdictions provide due

9   process to publishers and incarcerated persons when refusing to deliver publications and

10  other correspondence.  The Federal Bureau of Prisons has an explicit policy requiring it to

11  notify incarcerated persons and publishers, identifying the specific materials rejected and

12  allowing independent review of a rejection decision.  *See Thornburgh*, 490 U.S. at 406.

13        Defendants failed to provide due process protections to HRDC when refusing to

14  deliver its publications and correspondence to incarcerated persons at the Jail, even after

15  HRDC brought the problem to Defendants' attention by submitting a government tort

16  claim prior to filing this lawsuit.  Wright Decl. ¶¶ 42-44*.*  To date, Defendants have

17  censored at least 43 items of HRDC's mail, and HRDC did not receive meaningful notice

18  or opportunity to challenge the censorship of any of them.  *Id*. ¶¶ 28-31, 42.   The items of

19  mail were merely returned to HRDC via the USPS Return to Sender service, marked with

20  the phrases "staples not allowed" or "vendor not authorized," or with no markings at all

21  indicating why the items were rejected, without any further explanation as to why

22  Defendants had refused to deliver them.  *Id.* ¶¶ 29-31, 42.  At no point did Defendants

23  contact HRDC to provide notice that its mailings would be rejected or the reason(s) for the

24  rejections.  *Id.* ¶ 42.

25        Defendants may claim that rejecting the items of mail for delivery and returning

26  them to HRDC via the USPS Return to Sender service qualifies as "notice," but this is not

27  minimally adequate notice.  First, none of the returned items contained any notice of a

28  right to appeal the rejections, or any information on how HRDC could challenge the

1   censorship.  *Id.* ¶¶ 30-31, 42.  Second, the returned mailings did not provide meaningful

2   notice why the mail was rejected by Defendants.  The phrase "vendor not authorized," for

3   instance, without any information as to whether or how HRDC could be an authorized

4   vendor of books at the Jail, does not provide adequate due process.  Even the phrase

5   "staples not allowed" does not provide meaningful notice, as this purported basis for

6   rejecting HRDC's magazines was only provided after the items were returned to HRDC,

7   and there is nothing in Defendants' Mail Policy as written that states or even suggests that

8   staples are not allowed at the Jail.  *Id.* ¶ 46, Ex. K.  Even the County's summary rejection

9   of HRDC's government tort claim provided no explanation as to why HRDC's mailings

10   were censored or how HRDC could appeal the censorship.  *Id.* ¶ 44 & Ex. J.

11         Defendants wholly failed to provide HRDC with any opportunity to challenge the

12   censorship decisions, and Defendants' Mail Policy makes no provision for an appeal by the

13   sender of mail.  *See* Wright Decl. ¶ 46, Ex. K.  Indeed, any attempt to appeal would be

14   futile because the censored items of mail are not retained for secondary review by another

15   Jail official, as they were instead sent back to HRDC via the USPS Return to Sender

16   service.  *Id*. ¶ 28.  HRDC is thus likely to succeed on the merits of its due process claims.

17   **II.     A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT**
        **IRREPARABLE HARM.**
18

19         Defendants' unconstitutional policies and practices prevent HRDC from carrying

20   out its core function—to communicate with incarcerated persons about developments in

21   the law and protection of their health and personal safety.  Wright Decl. ¶¶ 13, 51.  As the

22   Supreme Court and Ninth Circuit have held, "[t]he loss of First Amendment freedoms, for

23   even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

24   *Burns*, 427 U.S. 347, 373 (1976); *see also Klein*, 584 F.3d at 1207-1208; *Warsoldier v.*

25   *Woodford*, 418 F.3d 989, 1001-1002 (9th Cir. 2005).  Courts have repeatedly found

26   irreparable harm based on the denial of First Amendment rights in correctional settings.

27   *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of

28   preliminary injunction against prison mail policy); *Human Rights Defense Center v. Sw.*

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]

1   *Va. Reg'l Jail Auth.*, 2018 WL 3239299, at *6 (W.D. Va. Jul. 3, 2018) (granting

2   preliminary injunction against jail authority's ban on staples); *Prison Legal News v.*

3   *County of Ventura*, No. CV 14–773–GHK (ex), 2014 WL 2519402, at *8 (C.D. Cal. May

4   29, 2014) (granting preliminary injunction against jail's postcard-only policy); *Prison*

5   *Legal News v. County of Sacramento*, No. 2:11-CV-00907 JAM-DAD, 2012 WL 1075852,

6   at *1 (E.D. Cal. Mar. 8, 2012) (granting preliminary injunction against jail's ban on

7   staples).

8          HRDC's magazines cover recent events and judicial decisions that affect the lives

9   and legal cases of incarcerated persons, and its books provide incarcerated persons with in-

10  depth information about their rights, protections and legal remedies, and on enrolling at

11  accredited higher educational, vocational and training schools.  Wright Decl. ¶¶ 6, 8.  The

12  ability to deliver its publications and correspondence timely—and before news becomes

13  stale or filing deadlines expire—is critical to HRDC's mission.  *Id.* ¶ 51.  If HRDC loses

14  the opportunity to deliver these publications to incarcerated persons, it has lost precious

15  opportunities to communicate with those persons at a time when that information will be

16  most useful, in furtherance of its mission to help incarcerated persons access educational

17  opportunities and educate themselves about their constitutional and human rights.  *Id.* ¶¶ 6,

18  8, 51.  Incarcerated persons also often move quickly in and out of jails, so if publications

19  and correspondence are not delivered on a timely basis, HRDC may lose contact with the

20  intended recipient permanently.  *Id.* ¶ 51.

21  **III.    THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION.**

22         Given the irreparable harm suffered by HRDC if a preliminary injunction does not

23  issue, the balance of equities here tips toward Plaintiff.  The irreparable harm suffered by

24  HRDC is concrete, severe and ongoing.  Wright Decl. ¶ 45.  HRDC is blocked from

25  distributing its publications and correspondence to incarcerated persons in Defendants'

26  custody, and without a preliminary injunction, Defendants will continue to censor HRDC's

27  communications without due process, banning HRDC's core protected speech.  By

28  contrast, any potential injuries to Defendants are minimal and speculative.  No great cost

21

[3501742.1]

1 or expenditure of time is required to allow HRDC to deliver its publications and

2 correspondence to incarcerated persons and afford constitutionally mandated due process,

3 as is already the case in correctional facilities across the country.  Wright Decl. ¶¶ 11-12.

4 Given the penological benefits of access to publications, the requested injunction would

5 likely improve security and rehabilitation at the Jail.  Clark Decl. ¶¶ 48-49.

6 **IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.**

7        Courts have "consistently recognized the 'significant public interest' in upholding

8 free speech principles … as the 'ongoing enforcement of the potentially unconstitutional

9 regulations … would infringe not only the free expression interests of [plaintiffs], but also

10 the interests of other people' subjected to the same restrictions." *Klein*, 584 F.3d at 1208

11 (citations omitted).  "The public interest inquiry primarily addresses impact on non-parties

12 rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir.

13 2002), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S.

14 at 22.  Defendants' mail policies and practices harm not only HRDC, but also other

15 publishers—who presumably have been and will continue to be censored without due

16 process if Defendants' unconstitutional policies and practices are not enjoined—and

17 incarcerated persons at the Jail.

18        It is in the public interest to allow incarcerated persons access to reading materials,

19 which enable them to engage in productive activity rather than sitting idle, thus helping to

20 avoid conflicts and incidents of violence.  Clark Decl. ¶¶ 24-25, 49.  By educating

21 incarcerated persons about their rights and key legal developments that affect their lives

22 and legal cases, HRDC encourages them to channel their energies into lawful methods of

23 dispute resolution.  Wright Decl. ¶ 13.  Reading materials also help incarcerated persons

24 keep their minds sharp, helping them prepare to become productive citizens when released

25 back into society.  Clark Decl. ¶ 26.  This speaks to the hunger for expressive freedom that

26 Justice Thurgood Marshall described in *Procunier*, 416 U.S. at 428 (Marshall, J.,

27 concurring) ("When the prison gates slam behind an inmate, he does not lose his human

28 quality; his mind does not become closed to ideas; his intellect does not cease to feed on a

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    free and open interchange of opinions …. It is the role of the First Amendment and this

2    Court to protect those precious personal rights by which we satisfy such basic yearnings of

3    the human spirit.").

4    **V.     THE BOND REQUIREMENT SHOULD BE WAIVED.**

5         Under Fed. R. Civ. P. 65(c), district courts have discretion to set the amount of the

6    bond accompanying a preliminary injunction, which includes setting no bond or only a

7    nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

8         Several factors here warrant waiver of the bond requirement. The "harm" to

9    Defendants if enjoined—*i.e.*, being forced to employ a constitutional mail policy—is

10   minimal and non-monetary, if it exists at all. *See Jorgensen v. Cassiday*, 320 F.3d 906,

11   919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it

12   concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

13   conduct."); *United Food & Commercial Workers Local 99 v. Brewer*, 817 F. Supp. 2d

14   1118, 1128 (D. Ariz. 2011) ("no realistic likelihood" defendants would be harmed by

15   injunction against enforcing law that violated the First Amendment).

16        Further, HRDC is a small nonprofit organization with a staff of approximately 17

17   employees, and does not have financial resources to post anything more than a nominal

18   bond. Wright Decl. ¶ 55; *see Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d

19   1177, 1191 (N.D. Cal. 2009) (not requiring small non-profit organization to post bond

20   because plaintiff "indicated it would have difficulty posting the bond"); *Cal. Indep. Sys.*

21   *Operator Corp. v. Reliant Energy Servs.*, 181 F. Supp. 2d 1111, 1130 (E.D. Cal. 2001)

22   (waiving bond requirement for not-for-profit public benefit corporation); *Prison Legal*

23   *News v. County of Ventura*, 2014 WL 2519402, at *10 (waiving bond requirement due to

24   plaintiff's "limited financial resources").

25        Requiring HRDC to post a bond would effectively deny access to prompt judicial

26   review. *See Flowers*, 408 F.3d at 1126. This is especially true because HRDC alleges

27   violations of its fundamental constitutional rights, seeks to vindicate the public interest,

28   and is likely to succeed on the merits. *See Hernandez v. County of Monterey*, 110 F. Supp.

[3501742.1]

1  3d 929, 958-959 (N.D. Cal. 2015) (bond waived where plaintiffs were "protecting

2  constitutional rights in the public interest, and they are likely to succeed on the merits");

3  *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (holding

4  that "to require a bond would have a negative impact on plaintiff's constitutional rights, as

5  well as the constitutional rights of other members of the public affected by the policy").

6  **CONCLUSION**

7  For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be

8  granted.

9

10  DATED:  February 21, 2020                  Respectfully submitted,

11                                              ROSEN BIEN GALVAN & GRUNFELD LLP

12

13                                              By:  */s/ Jeffrey L. Bornstein*

14                                                   Jeffrey L. Bornstein

15                                              Attorneys for
16                                              HUMAN RIGHTS DEFENSE CENTER

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[3501742.1]